UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|   Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 6:18-120-2 |
| | § | CRIMINAL NO. 6:18-144 |
| HECTOR GUERRA, | § | |
|   Defendant. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Defendant Hector Guerra's Motion to Suppress (6:18-CR-120-2, D.E. 167; 6:18-CR-144, D.E. 25), wherein he moves to suppress all evidence obtained during the execution of a search warrant at his residence and statements he made during a custodial interview following his arrest. An evidentiary hearing was held (8/18/2020 Hrg. Tr., D.E. 50), after which Defendant filed supplemental memoranda (D.E. 38, 39).[1]

**I. Factual Background**

On October 24, 2018, Defendant was indicted for conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana in Case No. 6:18-CR-120-2, and a warrant was issued for his arrest. The day before agents were to execute the arrest warrant, Arturo David Ibarra, Jr., a criminal investigator for the Starr County, Texas, District Attorney's Office assigned to the Border Prosecution Unit, prepared a search warrant affidavit (the "Affidavit") for Defendant's residence. In the Affidavit, Investigator Ibarra wrote:

> It is my belief that the property sought pursuant to the warrant requested herein constitutes evidence that an offense was committed, to-wit, Possession of Marihuana: and that Hector Guerra AKA PELON committed said offense.
>
> My belief is based on the following facts: Over the past several months the Starr County District [A]ttorney Office along with other agencies both state and federal

---

1. Defendant filed his motion to suppress in both cases. Unless otherwise noted, citations are to Case No. 6:18-CR-144.

1

> have been conducting an investigation into the Texas Chicano Brotherhood Gang here in Starr County, Texas. The investigation revealed that the Texas Chicano Brotherhood like any criminal street gang are organized, maintain rank, such as captains, lieutenants, and soldiers. The Texas Chicano Brotherhood gang has bi-laws [*sic.*], and members must follow orders from there [*sic.*] superior ranking members.
>
> Over the last several months Investigator Ibarra learned that the suspected party is an enforcer for the Texas Chicano Brother[hood] gang in Starr County. The enforcer is the individual whom orchestrates and pushes all the criminal activity the gang is involved in. Criminal activity to include aggravated assaults, assaults, home invasions, murders, extortions, kidnappings, narcotics smuggling, weapons smuggling and various other violent crimes.
>
> In early 2018 the suspected party was arrested for the possession of marihuana. During the scope of that investigation intelligence revealed that the suspected party was smuggling narcotics, specifically marihuana, in large quantities and has direct contact to the Gulf Cartel.
>
> It is my belief that the suspected party has evidence in his possession which can be beneficial to the investigation into the Texas Chicano Brotherhood gang. As an enforcer for the Texas Chicano Brotherhood Gang, the enforcer is tasked with many responsibilities for the gang and is a trusted member of whom has access to any and all business related to the gang.

Affidavit, D.E. 40, pp. 1–2.

The Affidavit went on to request authorization to enter Defendant's residence without knocking based on the following: "During the investigation Investigator Ibarra learned that the suspected party attended a Texas Chicano Brotherhood meeting on November 18, 2018 and the suspected party was in the possession of a AK-47 and a handgun." *Id.*, p. 2. On the basis of the Affidavit, a Starr County District Magistrate signed the search warrant on November 20, 2018.

Investigator Ibarra testified that both warrants were executed in the early morning hours of November 21, 2020, by a joint task effort that included state, local, and federal law enforcement officers. Shortly before the warrants were executed, Investigator Ibarra conducted a briefing with the investigative team, tactical team, and other agencies involved, during which he relayed that he had secured a search warrant signed by a district judge. A few minutes before the briefing began, Investigator Ibarra was shown a Facebook Live video Defendant had just posted, which depicted

narcotics residue and a firearm on a kitchen table inside his residence. Investigator Ibarra testified that he recognized the trailer's interior from photos taken during the investigation earlier that year, but he did not update the Affidavit, relay this information to the magistrate, and/or obtain a new search warrant.

Drug Enforcement Administration (DEA) Special Agent Matthew Dolengowski was part of the tactical team, whose job it was to secure Defendant and conduct a protective sweep of the residence. The team utilized an armored vehicle to breach the door and ordered all occupants to exit the residence. In less than two minutes, Defendant and two other individuals exited the trailer. During the protective sweep, SA Dolengowski observed, on top of a refrigerator and in plain view, a magazine containing 18 rounds of 9mm caliber ammunition. Residue and seeds from marijuana cigarettes were also found in ashtrays in plain view. SA Dolengowski testified that it is standard operating procedure not to "start the search for ourselves" during a protective sweep. "If it's not a person, we don't touch it. . . .We're just looking for human beings." Hrg. Tr. at 76:24–77:2.

Special Agent Joshua Aaron Wedesky with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) was part of a separate investigative team, whose job it was to execute the search warrant. SA Wedesky testified that he knew they had a search warrant signed by a district judge and that he had a good faith belief that he was executing a valid warrant when he entered Defendant's residence and searched. He never read the search warrant or Affidavit beforehand, but instead relied on Investigator Ibarra's representations regarding the language and scope of the warrant.

Underneath a pillow on Defendant's bed, SA Wedesky found two cell phones. He later obtained a federal search warrant to perform a forensic evaluation of the phones and uncovered numerous incriminating photos. Agents also found: a container of marijuana inside a kitchen cabinet; a semi-automatic pistol wrapped in underwear and a red bandana, stuffed inside an air-

conditioning vent in the floor of Defendant's bedroom; a black Star Wars marijuana grinder; various memorial cards for suspected Texas Chicano Brotherhood members; a box of ammunition inside a bedroom cabinet; other ammunition inside a bedroom drawer; a police scanner; a DVR recorder and TV to show live feed of cameras outside; a tactical vest; a night vision scope; and a two-way radio.

Following his arrest, Defendant was interviewed by SA Wedesky and a special agent with the Department of Homeland Security Investigations (HSI). SA Wedesky began the interview by informing Defendant that he had been indicted in a marijuana smuggling conspiracy and that he had been the subject of an investigation into the Texas Chicano Brotherhood gang, which included a Title III wiretap on his phone. SA Wedesky said that he did not want Defendant to say anything and that he was not "trying to get information out of [him]"; he just wanted to explain what was going on and to inform Defendant what evidence the government had against him. SA Wedesky then played a portion of a wiretapped conversation. He next told Defendant that he would like for Defendant to talk to them and read aloud the names of the alleged coconspirators in Case No. 6:18-CR-120. The HSI agent told Defendant that they didn't need him to admit to anything, but they wanted to give him the opportunity to talk. After Defendant asked for a phone call, SA Wedesky read Defendant his *Miranda* warnings. Defendant stated that he understood his rights. The following exchange then occurred:

> SA Wedesky: At this time, are you willing to answer questions? Talk to us a little bit?
>
> Defendant: No, sir.
>
> SA Wedesky: Nothing?
>
> Defendant:[Shakes head.] I ain't got nothing to say about it.
>
> SA Wedesky: Alright. Well, that's your right. We'll give that to you. And I'll let you know that the opportunity's not going to continue today. Okay? I mean, you

will have another opportunity to speak to us. . . . When you get to Victoria, and get with your lawyer, you'll have the opportunity to speak again if you want.

Defendant: Okay.

SA Wedesky: But I want you to know that, if you do decide to talk, you wouldn't be the only one that's talking. There's more than one. There's a reason that we were able to get up in your phones. There's a reason that, you know, certain arrests have been made. People are talking. Your friends, people that are in your organization, people that you call brothers. Those people are talking. So, you will have that opportunity. You wouldn't be the only one that's doing it. I just want you to remember that. Alright?

Defendant: Yes, sir.

SA Wedesky: I will also let you know that, during the search we conducted today, we found a gun in your bedroom.

Defendant: In my bedroom?

SA Wedesky: Yeah.

Defendant: What? I ain't got no guns in my bedroom, sir. I ain't got no guns. I'm clean, the house. The only thing ya'll coulda' found, scattered in some shelves, is some bullets from last year. But guns? I don't got no guns in my house. For real.

11/21/2018 Video of Interview, Gov't Hrg. Exh. 46.

Following this exchange, SA Wedesky asked Defendant if the gun found in the bedroom was his. SA Wedesky then acknowledged that Defendant had invoked his right to remain silent and that they could not go forward with any questions. The HSI agent continued to question Defendant about the gun in the Facebook Live video and whether Defendant owned a gun, and Defendant made additional statements. The interview then concluded.

On December 20, 2018, Defendant was indicted in Case No. 6:18-CR-144 for being a felon in possession of firearms and ammunition, to wit: (1) an Arms Corporation of the Philippines (Rock Island Armory), model M1911 A1 FS Tactical, .45 ACP caliber pistol; (2) 8 rounds of .45 auto caliber ammunition; (3) 18 rounds of 9mm caliber ammunition; (4) 57 rounds of .45 auto caliber ammunition; and (5) 40 rounds of .223 caliber ammunition.

**II. Motion to Suppress Evidence Discovered During Search**

Defendant argues that the search of his residence violated his Fourth Amendment rights because the Affidavit was bare bones and contained stale information regarding narcotics. He concedes the 18 rounds of 9mm caliber ammunition listed in Number 3 in Case No. 6:18-CR-144 was the product of a "protective sweep" and is therefore admissible. *See United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008). However, the firearm and remaining ammunition listed in Numbers 1, 2, 4, and 5 in Case No. 6:18-CR-144, as well as all other items seized, were the result of an exhaustive search in which drawers and cabinets were opened, furnishings were disturbed, and physical fixtures of the home were removed. He therefore moves to suppress all evidence seized in the search that exceeded the initial protective sweep of his residence.

**A. Legal Standard**

Under the exclusionary rule, which "was adopted to effectuate the Fourth Amendment right of all citizens, . . . evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). Because a search warrant was secured, the Court must first determine "'whether the good-faith exception to the exclusionary rule applies; if it does not, [the Court] must ascertain whether the warrant was supported by probable cause.'" *United States v. Rojas Alvarez*, 451 F.3d 320, 329–30 (5th Cir. 2006) (quoting *United States v. Gibbs*, 421 F.3d 352, 355 (5th Cir. 2005)).

The Fourth Amendment exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984). Under the good-faith exception, "evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible in the prosecution's case-in-chief, even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United*

6

*States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997) (quoting *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988)). In deciding if the good faith exception applies, courts ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922, n.23. The *Leon* court provided four situations in which the good faith exception does not apply: (1) the magistrate or judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his judicial role"; (3) the officer relied "on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; or (4) the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

Under the Fourth Amendment, the Texas Constitution, and the Texas Code of Criminal Procedure, a search warrant may only issue upon facts sufficient to satisfy the magistrate that probable cause exists to believe that illegal items will be found if the search is conducted. *See* U.S. Const. amend. IV; Tex. Const. art. 1, 9; TEX. CODE CRIM. PROC. § 18.01. Probable cause is determined "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). In order for a judge to perform this function, the search warrant affidavit must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant. *Whiteley v. Warden*, *Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971); TEX. CODE CRIM. PROC. § 18.01(b). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place; the affidavit must connect the place to be searched with the illegal activity and the evidence sought." *United States v. Dodd*, 349

F. Supp. 2d 1039, 1046 (W.D. Tex. 2004) (citing *United States v. Pace*, 955 F.2d 270, 276–77 (5th Cir. 1992)).

The facts set out in the affidavit must also not have become stale when the magistrate issues the search warrant. *Guerra v. State*, 860 S.W.2d 609, 611 (Tex. App. – Corpus Christi 1993, pet. ref'd). "Probable cause ceases to exist when, at the time the search warrant is issued, it would be unreasonable to presume the items remain at the suspected place." *Id.* "The proper method to determine whether the facts supporting a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the occurrence of the events set out in the affidavit and the time the search warrant was issued." *Hafford v. State*, 989 S.W.2d 439, 440 (Tex. App. – Houston [1st Dist.] 1999, pet. ref'd) (citing *Guerra*, 860 S.W. at 611).

**B. Analysis**

**1. Does the good-faith exception to the exclusionary rule apply?**

Defendant argues that the good-faith exception to the exclusionary rule does not apply because the Affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Leon*, 468 U.S. at 923. He maintains that the Affidavit was "bare bones" and contained stale information and only "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *See United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). "Generally, examples of bare bones affidavits include those that merely state that the affiant has cause to suspect and does believe or has received reliable information from a credible person and does believe that contraband is located on the premises." *United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) (citations, internal quotation marks, and alterations omitted).

The Government has conceded—and the Court agrees—that it was "not a real good warrant." Hrg. Tr. at 80:1-4. The Affidavit stated that Defendant was arrested for possession of

8

marijuana "in early 2018" and that the earlier investigation revealed that he was smuggling marijuana in large quantities; however, it provided no information linking the previous or current drug-trafficking investigations to Defendant's residence. The Affidavit also stated that Defendant was an enforcer for the Texas Chicano Brotherhood gang and had recently attended a gang meeting, where he was in possession of an AK-47 and a handgun; however, it did not state that the meeting was held at Defendant's residence or otherwise link the weapons or the gang's criminal activity to Defendant's residence, which the Government admitted "is one of the deficiencies of the warrant." Hrg. Tr. at 13:9-12. "Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought." *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003). The Affidavit is entirely devoid of such a nexus and provides no specific facts that would allow the magistrate to conclude that there was a fair probability that drugs, weapons, or other contraband would be found in Defendant's residence. Finally, when an affiant relies upon information obtained from an informant, the affiant must provide sufficient information to allow the magistrate to determine whether the informant's information is sufficient to create probable cause. *Illinois v. Gates*, 462 U.S. 213, 238–39, 240–41 (1983). Investigator Ibarra testified that he learned about the recent gang meeting from a confidential informant, but how he obtained this information was not included in the Affidavit.

Based on the above, the Court finds that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *See Leon*, 468 U.S. at 922, n.23. Had the investigative team of agents who performed the search read the Affidavit, they would have known that the search of Defendant's residence was based on insufficient evidence of probable cause and therefore was a violation of his Fourth Amendment rights.

### 2. Was the search warrant supported by probable cause?

The Court must next consider whether the search warrant was nonetheless supported by probable cause. "Probable cause must be established in the affidavit and evidence presented to the magistrate; an 'otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate.'" *United States v. Brown*, 567 Fed. App'x 272, 283 (5th Cir. 2014) (quoting *Whiteley*, 401 U.S. at 565 n.8). When the issuing judge relies solely on a supporting affidavit to issue a search warrant, "the existence of probable cause to support a warrant must be ascertained exclusively from the four corners of the affidavit." *Dodd*, 349 F. Supp. 2d at 1047 (citing *Whiteley*, 401 U.S. at 565 n.8)).

As set forth *supra*, the Affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Investigator Ibarra acknowledged that the Affidavit left out key details regarding the confidential informant, wiretap evidence that had been gathered in the nine months since Defendant's prior arrest for possession of marijuana, and any information regarding a reasonable belief that contraband would be found in the residence. There is nothing in the record to indicate that he relayed this or any other information to the magistrate before the warrant was signed. Investigator Ibarra testified that "the judge has a right to ask me and he does, in fact, if he has any questions regarding the warrant." Hrg. Tr. at 36:6-7. However, he could not "specifically recall what [the judge] asked or how he asked." *Id.* at 42:25–43:1.

The Court finds that the search warrant was not supported by probable cause and that the good-faith exception to the exclusionary rule does not apply. The search of Defendant's home after the initial protective sweep incident to his arrest therefore violated his Fourth Amendment rights. The 18 rounds of 9mm caliber ammunition listed in Number 3 in Case No. 6:18-CR-144 is admissible; however, all evidence obtained as a result of the unlawful search of Defendant's

10

residence, including the photographs obtained during the forensic search of Defendant's phones, must be suppressed.

**III. Motion to Suppress Custodial Statements**

Defendant further seeks to suppress portions of his post-arrest interview that violate his Fifth Amendment rights, namely, any statements he made during his continued interrogation by agents after he invoked his right to remain silent.

**A. Legal Standard**

The Fifth Amendment protects a criminal defendant against being "compelled . . . to be a witness against himself" during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). *Miranda* requires law enforcement officers to, in clear and unequivocal terms, notify an accused individual of his or her right to remain silent and assure that this right is "scrupulously honored." *Id.* at 478–79; *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). Unless a suspect "voluntarily, knowingly and intelligently" waives his or her right to remain silent, "any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (citing *Miranda*, 384 U.S. at 444).

Once an individual expresses his or her desire to remain silent, the interrogation "must cease." *Miranda*, 384 U.S. at 473–74. The term "interrogation" includes not only "express questioning," but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "[O]nce invoked, the police may not make any further attempts to elicit statements from that person unless that person initiates further communication." *Hopper v. Dretke*, 106 F. App'x 221, 230 (5th Cir. 2004) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). Finally, "[a]n accused's

11

postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request [to remain silent] itself." *Smith v. Illinois*, 469 U.S. 91, 92 (1984).

### B. Analysis

There is no question Defendant explicitly invoked his right to remain silent. Under *Miranda* and its progeny, the agents should have immediately terminated the interrogation at that point. Instead of ensuring that Defendant's right to remain silent was "scrupulously honored," they continued, in the Government's own words, "trying to encourage him to cooperate with the government." Hrg. Tr. 13:22-23. While not framed as a question, SA Wedesky should have known that his statement that agents had found a gun in Defendant's bedroom during the search was reasonably likely to elicit an incriminating response from Defendant. Unlike the beginning of the interview, SA Wedesky was not merely informing Defendant of any charges against him, and he did not tell Defendant that he did not want him to respond. Finally, the Government's argument that Defendant's statements are nonetheless admissible because they were *res gestae* has previously been rejected in this circuit. "A statement subject to exclusion by virtue of *Miranda* cannot be salvaged by being denominated as '*res gestae*.'" *Brown v. Beto*, 338 F. Supp. 1358, 1361 (S.D. Tex. 1971), *aff'd*, 468 F.2d 1284 (5th Cir. 1972), (citing *Shedrick v. Maryland*, 271 A.2d 773, 776 (1970) ("We find that since the interrogation was a custodial interrogation, it could not be admissible under the *res gestae* rule.")); *see also Washington v. Estelle*, 525 F.2d 1213, 1214 (5th Cir. 1976).

The Court finds that all statements made by Defendant after he invoked his right to remain silent are inadmissible and must be suppressed.

### IV. Conclusion

12

For the foregoing reasons, Defendant's motion to suppress (6:18-CR-120-2, D.E. 167; 6:18-CR-144, D.E. 25) is **GRANTED**.

It is so **ORDERED** this 2nd day of February, 2021.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE